[No. 5831.]

## STEELE V. THE PEOPLE.

**Practice in Criminal Actions—Homicide—Plea of Self-Defense —Avoiding Further Trouble.**

Ill feeling existed between defendant and deceased, growing out of a dispute over water. Defendant had said, in effect, that he would shoot any one interfering with the water. On the evening before the homicide, the brother of deceased had told defendant that they were coming up in the morning, and that there would be something doing. On the morning of the homicide, deceased and two companions came on defendant's ranch and proceeded up the ditch for some distance, then, after a short consultation, they started towards him in a fast walk. Deceased was carrying a rifle, one of his companions a shovel, while the other, a man of 74 years of age, was wholly unarmed. The defendant was armed with a rifle, and standing near some old buildings on the ranch. When they were about 200 feet distant, he ordered them to halt. The deceased threw his rifle across his right arm, and, applying an epithet to defendant, they continued to advance, when defendant fired a warning shot, and deceased returned the fire. Defendant then took shelter in one of the old buildings, and deceased, after reloading his gun, retreated in an oblique *direction from the building*, and defendant again fired at him with intent to inflict a mortal wound. In the meantime the others, without any hostile demonstration, had run, and, while the evidence was somewhat conflicting as to the location of deceased when killed by defendant's third shot, it was shown that he was shot in the back. Held, that, while the defendant might have been justified in firing the first shot, in firing the second shot he became the assailant; and, since he did not then endeavor in good faith to avoid any further struggle before killing deceased, he is not entitled to invoke the law of self-defense. —P. 115.

*Error to the District Court of Larimer County.*
*Hon. James E. Garrigues, Judge.*

John A. Steele was convicted of murder in the second degree, and he brings error. ⸱    *Affirmed.*

Mr. G. A. CARLSON and Mr. R. W. FLEMING, for plaintiff in error.

Mr. WM. H. DICKSON, attorney general, and Mr. S. H. THOMPSON, assistant attorney general, for the people.

Mr. JUSTICE GABBERT delivered the opinion of the court:

Plaintiff in error, defendant below, was convicted of murder in the second degree. He complains that the trial court erred in instructing the jury on the law of self-defense. It may be conceded that the learned judge did not correctly state the law on the subject frequently referred to as the doctrine of "retreat to the wall," as established by the decisions of this court in *Ritchey v. People,* 23 Colo. 314; *Boykin v. People,* 22 Colo. 496; and *Babcock v. People,* 13 Colo. 515, and other cases, but the defendant cannot complain, because the evidence does not disclose a case to which the law of self-defense contended for by his counsel applies.

There was ill feeling between the defendant and deceased, growing out of a dispute over water. On the morning of the homicide the deceased and two companions entered the ranch occupied by the defendant, or which was under his control, and proceeded up a ditch for the purpose of turning the water which the deceased claimed he was entitled to. According to the prosecution, the defendant, the day previous, had sent an express message to the de-

ceased to the effect that he then had full charge of
the ranch, and the water; and was in possession; and
that he would kill the first man who interfered with
the ditches or water.   When the deceased and his
companions entered the ranch the defendant was
standing near some old buildings.   They continued  ·
on up the ditch for a considerable distance, and then
concluded to have a talk with the defendant about
the water.   The deceased was carrying a rifle, one
of his companions had a shovel, while the other was
wholly unarmed, and was seventy-four years of age.
They started towards the defendant.   At this time
they were a considerable distance from him, some-
thing like 150 yards.   He was standing behind a
post.   They had proceeded between 25 and 50 yards
when the defendant called to them to halt, and im-
mediately fired a shot.   They heard the whiz of the
bullet.   The deceased and one of his companions
started to run to the left, and the other to the right.
The defendant again fired, when the deceased turned
and ran in the opposite direction.   The companions
of deceased were endeavoring to reach a place of
safety.   The defendant then fired the third, and
fatal, shot, which, according to the direction the
deceased was running, entered from behind.   The
physician who examined the wound testified that the
deceased was shot in the back.   After firing the first
shot, the defendant entered an old barn and fired the
second and third shots from inside this structure.
The defendant was distant from the deceased about
thirty-five yards when the fatal·shot was fired.   The
deceased did not fire any shot, but his gun was dis-
charged involuntarily at the time he was shot, but
not towards the defendant.   The defendant fired a
fourth shot at one of the companions of the deceased.
Clearly from this testimony there was none calling

8

for submission to the jury of the question of self-defense. The defendant was not justified in firing the first shot. The deceased and his companions were about one hundred yards distant. They were approaching him for a lawful purpose when he fired upon them without any provocation. But waiving this part of the testimony, it appears that the deceased was shot in the back, and was endeavoring to escape when the fatal shot was fired, and that the others were not making any hostile demonstrations, but were, also, endeavoring to escape; so that the defendant had no occasion, as a reasonably prudent person, to take the life of the deceased in order to protect himself. According to the testimony of the defendant, he was posted at the point described by the prosecution with the expectation that the deceased would come up the ditch that morning. In a conversation with the brother of deceased the evening before the homicide, the brother had said they were coming up in the morning, and there would be something doing. When the deceased and companions reached the point on the ditch mentioned in the testimony on the part of the state, they stopped and held a short consultation. They then started towards him on a fast walk. When about 200 feet distant he ordered them to halt. They paid no attention to the order, but continued to advance; the deceased threw his gun across his right arm, at the time applying an epithet to the defendant. The defendant then fired what he termed the warning shot, between the deceased and his brother. The deceased jumped to the left and returned the fire. The defendant then took shelter in the old barn mentioned in the testimony for the prosecution, and took his stand at a door, the lower half of which was closed. Deceased at this time was running away

from the point where the defendant was stationed, not directly, but in a direction which was not towards the defendant, and which put him in a position with his side towards the defendant. The deceased had re-loaded his gun. The defendant fired at him as he was retreating, with intent to inflict a mortal wound, but missed. The deceased reached a fence. Whether he disappeared for a time, and then returned to the point where he received the fatal wound, is not altogether clear. The defendant first says he reached the corner of the fence, was crouched in a corner; that all the defendant could see of the person of the deceased was a patch through the fence; that he fired between the rails and struck the deceased. He does not say at this time the deceased could see him, or that he had pointed his gun towards him. The distance between the parties at this time was about 75 feet. At another place he says the deceased had run out of his sight, but he came back, "looked me in the eye until he got where he raised his gun." The defendant admits making the threat, but not altogether in the language detailed by the witnesses for the prosecution. Enough appears, however, from his own statement, from which to deduce the conclusion, that he had said, in effect, he would shoot any one who interfered with the water.

We do not think this makes a case which justified the defendant in taking the life of the deceased. It may be conceded, though not necessarily determined, that the defendant was justified in firing the first shot, when the deceased and his companions continued to advance, after he warned them to approach no nearer. He then took shelter in a place of comparative safety. The deceased, after firing, was in the open, 200 feet away. He had re-loaded his gun, but was retreating. One of his companions was wholly unarmed; the other had a shovel, but no dan-

ger could be apprehended from that implement, except in close quarters. Circumstances at this juncture of the affray were not such as to induce a reasonable belief in the mind of a man of ordinary reason and firmness that there was any necessity to take the life of the deceased in order to save his own life, or prevent his receiving great bodily harm. Neither of the companions of the deceased had made any hostile demonstrations. In fact, there is no other inference from the testimony of defendant but the one that they were seeking a place of safety. Notwithstanding these conditions, the defendant fired at the deceased from inside the barn, with intent to inflict a mortal wound. In these circumstances the defendant was not justified in firing a second shot at the deceased with intent to take his life; and when he did, whatever may have been his legal status before, he became the assailant.

With respect to what happened subsequently it is sufficient to say that, according to the statements of the defendant, the deceased, after the second shot was fired by the defendant, was doing nothing more than endeavoring to protect himself; and his companions had sought, or were merely seeking, a place of safety. The defendant had not sought to avoid any further struggle after firing the second shot, which, under the circumstances, made him the assailant. One who is the first assailant, who does not really and in good faith endeavor to avoid any further struggle before taking life, is not entitled to invoke the law of self-defense.

This conclusion obviates the necessity of considering the other errors assigned on behalf of defendant.

We again call the attention of the district judges and district attorneys to the modification of the old doctrine of "retreat to the wall," as established in

this jurisdiction by the cases above referred to, and others.

The judgment of the district court is affirmed.

*Affirmed.*

CHIEF JUSTICE STEELE and Mr. JUSTICE CAMPBELL concur.